UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In the Matter of the Tax Liabilities of: John Does, :
United States Taxpayers Who During the Years :
Ended December 31, 2000, 2001, 2002, 2003 and :
2004 Were (i) Holders of or (ii) Other Final :
Recipients of Income Attributable to Interest :
Earned On Bonds That Comprise City of :
New Orleans, State of Louisiana, $75,205,000 :
Refunding Certificates of Indebtedness, :
Series 1998B CUSIP Nos. 6476342W(2), :
6476342X(1), 6476342Y(9), 6476342Z(6), :
6476343A(0), 6476343B(8), 6476343C(6), :
6476343D(4), 6476343E(2), 6476343F(9), :
and 6476343G(7) :
-----------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES' EX PARTE PETITION FOR LEAVE TO SERVE ADMINISTRATIVE JOHN DOE SUMMONS

### Introduction

The United States of America respectfully submits this memorandum of law in support of its *ex parte* petition for leave to serve an administrative John Doe summons on the Bank of New York Trust Company ("the Bank"). A copy of the proposed John Doe summons is attached as Exhibit A to the Ex Parte Petition for Leave to Serve an Administrative John Doe Summons.

The Internal Revenue Service is investigating the tax liabilities of an ascertainable class of unidentified United States taxpayers, who were holders of, or final recipients of income attributable to, bonds known as the City of New Orleans, State of Louisiana, $75,205,000 Refunding Certificates of Indebtedness, Series 1998B (the "Certificates" or "1998B Certificates") issued by the City of New Orleans in 1998. The Certificates were marketed and sold as tax-exempt obligations under Section 103 of the Internal Revenue Code, which excludes from gross income interest on qualifying state and local bonds. See 26 U.S.C. § 103(a). But, as

explained within, the Internal Revenue Service determined that interest earned on the Certificates is not tax-exempt on various grounds, including that the Certificates are not refunding bonds and are arbitrage bonds. Given that the Certificates were marketed and sold as tax-exempt obligations, the Internal Revenue Service reasonably believes that the final recipients of income attributable to interest earned on the Certificates may have failed to properly report that income.

Pursuant to Sections 7601 and 7602 of the Internal Revenue Code, Congress has charged the Internal Revenue Service with investigating taxpayers' compliance with revenue laws and has given the IRS expansive information-gathering authority to conduct such investigations. See United States v. Arthur Young & Co., 465 U.S. 805, 816 (1984) ("In order to encourage effective tax investigations, Congress has endowed the IRS with expansive information-gathering authority."); United States v. New York Telephone Co., 644 F.2d 953, 955 (2d Cir. 1981) ("The IRS has long had broad power . . . to issue administrative summonses to examine any [records] that may be relevant or material to an inquiry into compliance with the internal revenue laws. It has not only the right to obtain records held by the taxpayer, but also the power to summon . . . from 'any person' who holds records 'relating to the business of the person liable for the tax.'").

Where, as here, the Internal Revenue Service seeks information concerning unknown individuals, the rules governing issuance of a "John Doe" summons apply. See 26 U.S.C. § 7609(f). Prior to serving a John Doe summons, the Internal Revenue Service must obtain judicial approval. Id. Specifically, the Internal Revenue Service must demonstrate to the Court, as has been done below, that (1) the summons relates to the investigation of a particular person or an ascertainable group or class of persons; (2) there is a reasonable basis for believing that such person or group may fail or may have failed to comply with any internal revenue law;

and (3) the information sought cannot be readily obtained elsewhere. Id. Pursuant to 26 U.S.C. § 7609(h)(2), the judicial proceeding to obtain approval to issue a John Does summons is *ex parte*.

The proposed John Doe summons seeks from the Bank documents and other data indicating the names, addresses, and taxpayer identification numbers of all holders of, or other final recipients of interest on, the Certificates, the amounts of interest paid, on what dates, and to what entities. The offering materials provided that the Certificates were to be fully registered in the name of Cede & Company (Cede), as holder of the Certificates, and as nominee for the Depository Trust Corporation (DTC). See Declaration of Revenue Agent Alma S. Dripps ("Dripps Decl."), ¶ 35 (attached to the Ex Parte Petition for Leave to Serve an Administrative John Doe Summons as Exhibit B). DTC acted as the securities depository and clearing agency for the Certificates. Id. Principal of premium, if any, and interest on the Series 1998 Certificates was payable to Cede and DTC on behalf of the City. Id. Cede and/or DTC was to remit these payments made on the City's behalf to the Bank, as the City's paying agent. Id. In turn, the Bank made the interest payments to the beneficial owners of the Certificates. Id. On April 6, 2004, the United States District Court for the Southern District of New York issued an order authorizing the issuance and service of John Doe summonses on Cede and DTC to assist the Internal Revenue Service in its effort to learn bondholder names, addresses and other identifying information so the IRS could review their tax returns to determine whether they properly included the interest in their gross income for federal tax purposes. Id., ¶ 36. Since serving the John Doe summonses on Cede and DTC, the IRS has learned that the Bank, as the City's paying agent, possesses the bondholder/taxpayer identifying information the IRS is seeking to obtain

through this application. Id., ¶ 36.

Jurisdiction for the *ex parte* proceeding to obtain leave to serve a John Doe summons lies in the United States District Court for the district where the person to be summoned resides or is found. See 26 U.S.C. § 7609(h)(1). Because the principal place of business for the Bank's Bond Operations is located at 111 Sanders Creek Parkway, East Syracuse, New York, this Court has jurisdiction to entertain the petition. See Dripps Decl., ¶ 4.

### Background Regarding 1998B Certificates, IRS Determination that Certificates Are Not Tax-Exempt Bonds, and IRS Investigation to Determine Tax Liabilities of Recipients of Interest on Certificates

*A.     1998B Certificates*

Prior to 1983, the City of New Orleans was responsible for the New Orleans Police Pension System (the "City's Pension Fund"). Dripps Decl., ¶ 5. In 1983, the City elected to merge its Pension Fund with the State of Louisiana's Municipal Police Employees' Retirement System ("MPERS") and became a participating employee. Id. MPERS is a cost-sharing, multiple employer retirement system established by the State, and since its establishment in 1973, has provided retirement benefits for municipal police officers in the State. Id., ¶¶ 5-6.

MPERS operates as a defined benefit plan. Id., ¶ 6. The retirement benefits to be paid to an employee is determined in advance of the employee's retirement, based on factors such as length of service and salary. Id. The amount is not tied to investment performance of contributions made on an employee's behalf. Id. Each year, an actuary determines the present value of each member's expected benefit payable at retirement or death, based on age, length of service, gender and compensation. Id. On the basis of this valuation, MPERS determines the employer's contribution rate. Id. Because employer contributions, along with employee

contributions, must satisfy the cost of all benefits payable on the employee's behalf, any shortfall from the actuarial valuation is corrected by modifying the employer's current contribution amount. Id.

On March 5, 1983, the City merged its Police Pension Fund with MPERS (the "1983 Merger"). Id., ¶ 8. On that date, the then-present value of all future benefits related to the City's Pension Fund's current employees and its retired members and beneficiaries being merged into MPERS was computed; these were the City's Accrued Liabilities. Id. The Merger Agreement between the City and MPERS required the City to pay 60 percent of its Accrued Liability for employees being merged into MPERS, and 100 percent of the Accrued Liability for retired members and beneficiaries being merged into MPERS, for a total of $99,527,995. Id. The Merger Agreement required the City to make an initial cash payment, as well as a quarterly payment for 30 years on the Accrued Liabilities, with interest at the rate of 7.0 percent per annum. Id., ¶ 9.

On September 15, 1983, the City and MPERS amended the original Merger Agreement to include in the calculation of pension benefits payable to current employees their military service before the Merger date. Id., ¶ 10. This increased the City's Accrued Liability for current members, and increased its quarterly payment to MPERS. In 1993, changes in the law increased benefits to disabled retirees, and increased widows' and children's payments and the City and MPERS again amended their Merger Agreement. Id., ¶ 11. The 1993 Amendment increased the City's Accrued Liability for retired members and their beneficiaries. Id.

On May 7, 1998, the City issued its Series 1998B Certificates in the amount of $75,205,000 to refund the balance of its Accrued Liability incurred pursuant to the 1983 Merger

Agreement. Id., ¶ 12. The yield on the Certificates was 4.8160695 percent. Id. In contrast, the rate of return on MPERS' investments varied from 5.76 and 12.72 percent from 1983 to 1998. Id., ¶ 7. The City prepaid its merger balance during 1998, using proceeds of the Certificates. Id., ¶ 12.

In the offering statement for the Certificates, the Certificates were marketed as tax exempt obligations under I.R.C. § 103, which excludes from gross income interest on state and local bonds Id., ¶ 33. In addition, the City filed the Form 8038-G tax return (Information Return for Tax-Exempt Governmental Obligations) in connection with the Certificates, reporting that the Certificates were issued for government purposes. Id.

## B. IRS Determination that Certificates Are Not Tax-Exempt Bonds

In 2001, an IRS revenue agent with comprehensive training in tax-exempt bond law, Alma Dripps, began auditing the City's Series 1998B Certificates to determine whether they were properly considered tax-exempt under Section 103 of the Internal Revenue Code. Id., ¶¶ 1-3. As a result of that audit, the IRS concluded that the 1998B Certificates were not tax-exempt because such bonds were not refunding bonds and were arbitrage bonds. Id., ¶ 13. The basis for the IRS's determination is set forth below.

Section 103(a) of the Internal Revenue Code excludes from gross income the interest paid on any state or local bond. Section 103(b)(2) provides, however, that this exclusion from gross income is not applicable to arbitrage bonds within the meaning of Section 148 of the Code. See I.R.C. § 103(b)(2). Under certain circumstances, refunding bonds are not subject to the arbitrage rules of the Code. See 26 C.F.R. § 1.148-9(b)(1) and (d)(2)(ii) *in conjunction with* 26 C.F.R. § 1.148-6(b)(1) and 26 U.S.C. § 148(c).

A refunding issue generally means an issue of obligations the proceeds of which are used to pay principal, interest, or redemption on "a prior issue." See 26 C.F.R. § 1.150-1(d)(1). A "prior issue" generally means an issue of obligations all or a portion of the principal and interest on which is paid or provided for with proceeds of the refunding issue. See 26 C.F.R. § 1.150-1(d)(5). Obligation means any valid evidence of indebtedness under general Federal income tax principles. See 26 C.F.R. § 1.150-1(b). Thus, there can be no refunding issue unless the prior issue is a debt under general Federal income tax principles. In the case of the 1998B Certificates which as indicated above were denominated "Refunding Certificates," the Internal Revenue Service determined that the prior issue was not a debt within the meaning of Federal income tax principles. See Dripps Decl., ¶ 17.

A debt is "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957). To determine whether a debt exists for tax purposes, all facts and circumstances are to be examined, with no one factor controlling. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 696-697 (3d Cir. 1968); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

The City's Accrued Liability was not "an unqualified obligation to pay a sum certain" for two reasons. See Dripps Decl. ¶ 16. First, the Accrued Liability was not separate from the City's liability for current contributions to MPERS. On the Merger date, the Accrued Liability reflected an estimate of pension liabilities arising prior to the Merger; corrections for shortfalls and deviations from the actuarial assumptions could be, and were, passed on to the City. Id. MPERS annually updates the actuarial assumptions in determining required current contribution rates.

Id., ¶¶ 6, 16. Thus, if an incorrect assumption was used to determine the Accrued Liability in 1983, the City will correct the error in current contributions. Id.

Second, it is clear that the State could – and did – change pension benefits, which had the effect of changing the "sum" that the City owed. Id., ¶¶ 10, 11. Only six months after the Merger, the City and MPERS amended the Merger Agreement to increase the City's Accrued Liability to allow a credit for active employees who completed military service before the merger date. Id., ¶ 10. In 1993, the State Legislature retroactively improved pension benefits, and the City's Accrued Liability increased again. Id., ¶ 11.

Based on the foregoing analysis, the Internal Revenue Service concluded that the City's Accrued Liability was not a debt and therefore was not an obligation within the meaning of Section 1.150-1(b) of the Treasury Regulatiosn. Id., ¶ 17. Consequently, the IRS further concluded that the 1998B Certificates are not a refunding issue as defined by Section 1.150-1(d)(1) of the Treasury Regulations. See id., ¶ 13.

As noted above, in addition to determining that the Certificates are not refunding bonds, the Internal Revenue Service also determined that the Certificates are arbitrage bonds. A bond is an arbitrage bond when at the time of its issuance its gross proceeds are reasonably expected to be used directly or indirectly invested in higher yielding investments. See 26 U.S.C. § 148(a). A "higher yielding investment" is any "investment property" producing a yield over the term of the issue that is "materially higher" than the yield on the issue. See 26 U.S.C. § 148(b). Pursuant to Section 148(b)(2) of the Internal Revenue Code "investment property" includes, among other things, securities, obligations, annuity contracts, or any investment-type property, which is defined by IRS regulations to include any property that is held principally as a passive vehicle for

-8-

the production of income.[1] See 26 C.F.R. § 1.148-1(e)(1). "Production of income" includes any benefit based on the time value of money, including the benefit from making a prepayment. Id. Finally, IRS regulations define a "materially higher" yield as one that exceeds the yield on the original issue by more than one-eighth of one percentage point. See 26 U.S.C. § 1.148-2(d)(1) and (2).

The 1998B Certificates are arbitrage bonds because on the date of their issuance, the City reasonably expected to purchase investments the yield on which would be materially higher than the yield the City was to pay on the 1998B Certificates. See 26 U.S.C. § 148(a); Dripps Decl., ¶ 28. Specifically, the Certificates had a yield of 4.8160695 percent while the rate of return on MPERS investments varied from 5.76 to 12.72 percentage between 1983 and 1998. See Dripps Decl., ¶ 31. The City used the proceeds of the 1998B Certificates to acquire investment property

---

[1] Congress added the concept of "investment-type property" to the Internal Revenue Code when it expanded the anti-arbitrage rules. The legislative history makes clear that Congress intended investment-type property to include, in addition to such things as securities, any annuity or deferred payment contract or deferred compensation arrangement and, further, specifically targeted the use of such devices to fund pension plans. See H.R. CONF. REP. NO. 99-841, at II-747 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4833 & 4835; H.R. REP. NO. 99-426 at 518, 552 (1985). The House Report states:

> ... a few governments have issued bonds in order to purchase annuity contracts from insurance companies. The purpose of these transactions is to fund unfunded liabilities of public employee pension plans. In essence, these transactions produce arbitrage profits which would not be allowed if bond proceeds were invested directly by the issuing government. In view of the substantial amount of unfunded pension liabilities of State and local governments and because there has been no explicit Congressional decision to assume responsibility for those liabilities, the bill prohibits the issuance of bonds for such purpose.

H.R. REP. NO. 99-426, at 518 (1986).

either by indirectly acquiring securities and obligations or indirectly by acquiring a deferred payment contract. Id., ¶ 27.

When the City transferred the proceeds of the 1998B Certificates to MPERS, MPERS invested the proceeds, and used the proceeds and investment earnings on those proceeds to reduce or at least to keep the City's current contribution rates from increasing. Id., ¶ 29. As a result, the success of investments credited to the City's account can directly affect the amount that it has to pay in current contributions. Id. Thus, the City indirectly used the proceeds of the 1998B Certificates to acquire a pro rata share of each investment credited to its account at MPERS. Id.

The situation here is parallel to the situation in Revenue Ruling 80-257 where a city proposed to issue bonds to pay its unfunded liability in a pension fund for the city's firefighters. In Rev. Rul. 80-257 a state created a pension fund for a city's firefighters which was separate from the state and the city. The state established the amount of benefits that the pension fund would pay to pensioners based on age, salary and years of service, but not on investment return on the funds' assets. The city had responsibility for the liabilities of the pension fund; the state required the city to levy sufficient taxes to pay the city's unfunded liability over a 20-year period and to pay the current contributions. The city proposed to issue bonds to pay its unfunded liability; the pension fund would invest the proceeds of the bonds in investments with materially higher yields than the yield on the bonds. The city expected that the investment return on the investment of bond proceeds would substantially decrease the amount of taxes the city would otherwise need to collect to fund the previously unfunded pension liability. The IRS ruled that the prospective bonds would be arbitrage bonds because success or failure of the investments in

the pension fund into which proceeds of the bonds would be deposited would directly affect the amount of taxes that the city must levy in future years. In short, like here, the city issued the bonds because it anticipated a substantial and direct benefit from the investments in which the bond proceeds were invested.

In addition to considering the proceeds of the 1998B Certificates to have been used to indirectly acquire securities and obligations, the proceeds can also be considered to have been used to acquire "investment-type property" withing the meaning of Section 148(b)(2)(D) of the Code, specifically, a deferred payment contract. See Dripps Decl., ¶ 30. As previously indicated, Congress intended investment-type property to include annuity or deferred payment contracts and specifically warned against the used of those devices to fund pension plans.[2] When the City transferred the proceeds of the 1998B Certificates to MPERS, the City received a deferred payment contract. See Dripps Decl., ¶ 30. MPERS deposited the proceeds of the 1998B Certificates into the City's account and invested the proceeds. Id. The proceeds of the Certificates and earnings on the proceeds will be used to pay the City's pension benefits. Id.

Based on the foregoing, the IRS determined that the Certificates were arbitrage bonds within the meaning of Section 148 and the interest paid on them was not tax-exempt. Id., ¶¶ 31-32.

As a result of the Internal Revenue Service's determination that the 1998B Certificates did not qualify as tax-exempt, the IRS issued a Proposed Adverse Determination Letter to the

---

[2] See supra fn. 1. See also H.R. REP. NO. 99-426, at 552 (1985) ("purchase of an annuity contract to fund a pension plan of a qualified governmental unit would be subject to the same arbitrage restrictions as would direct funding of that plan with bond proceeds . . . Similarly, investment of bond proceeds in any other type of deferred payment investment-type contract to fund an obligation of the issuer . . . would be subject to these yield restrictions.")

City setting forth its reasons for finding that the interest income attributable to the Certificates was not tax-exempt. Id., ¶ 13.

C.   *IRS Investigation to Determine Tax Liabilities of Recipients of Interest on Certificates*

As a result of its determination that the interest on the Certificates was not tax-exempt, the Internal Revenue Service is seeking information necessary to determine the income tax liabilities of the bondholders or final recipients of interest on the Certificates. The IRS has reason to believe that recipients of the bond interest may have underreported their tax liabilities attributable to the Certificates. See Dripps Decl., ¶ 33. The Certificates were marketed and sold as tax-exempt obligations under Section 103 of the Internal Revenue Code. Id. The City filed Forms 8038-G, which apply only to tax-exempt bonds. Id. It is, therefore, likely that taxpayers who have received income attributable to interest earned on the Certificates treated the income as tax-exempt.

The IRS has been unable to obtain information necessary to determine the income tax liabilities of the recipients of interest on the Certificates and cannot do so without the Court's intervention. The IRS has not been provided with Forms 1099 reflecting the identities of the taxpayers that received interest on the Certificates and the amount of interest received. See Dripps Decl., ¶ 34. Thus, the IRS is seeking to obtain information from the Bank that will enable it to identify the bondholders or recipients of interest and the amounts of interest they received and in what years. Id., ¶¶ 36-37.

Argument

Leave to issue and serve upon the Bank the John Doe summons attached as Exhibit A to the Petition should be granted because the requirements of Section 7609(f) of the Internal

Revenue Code are met.

As noted in above in the introduction, where the Internal Revenue Service seeks information concerning an unknown individual, the rules set forth in 26 U.S.C. § 7609(f) governing the issuance and service of a "John Doe" summons apply. See 26 U.S.C. § 7609(f). Prior to serving a John Doe summons, the IRS must obtain judicial approval. See 26 U.S.C. § 7609(f); Tiffany Fine Arts v. United States, 469 U.S. 310, 316-17 (1985). Pursuant to Section 7609(f) of the Code, the IRS must demonstrate to the Court that (1) the summons relates to the investigation of a particular person or an ascertainable group or class of persons; (2) there is a reasonable basis for believing that such person or group may fail or may have failed to comply with any internal revenue law; and (3) the information cannot be readily obtained elsewhere. See 26 U.S.C. § 7609(f); In re Tax Liabilities of John Does, 688 F.2d 144, 147 (2d Cir. 1982). The Court reviews the application for leave to serve a John Doe summons *ex parte*, solely on the basis of the government's petition and supporting affidavits.[3] See 26 U.S.C. § 7609(h)(2); Tiffany Fine Arts, 469 U.S. at 317; In re Tax Liabilities of John Does, 688 F.2d at 148.

As outlined below, the requirements of Section 7609(f) are satisfied here.

1. John Doe Summons Relates to Investigation of Particular Group of Taxpayers

The John Doe summons relates to the investigation of a particular group of United States

---

[3] A summoned party may not subsequently challenge enforcement of a John Doe summons on the grounds that the service requirements of 26 U.S.C. § 7609(f) were not met at the ex parte proceeding. See In re Tax Liabilities of John Does, 688 F.2d at 145-46; John G. Mutschler & Assoc., 734 F.2d at 366; United States v. Samuels, Kramer and Co., 712 F.2d 1342, 1346 (9th Cir. 1983). Rather, the only defense available to a summoned party seeking to challenge enforcement of a John Doe summons is that the government has not met the requirements enunciated in United States v. Powell, 379 U.S. 51, 57-58 (1964). See In re Tax Liabilities of John Does, 688 F.2d at 147-49; John G. Mutschler & Assoc., 734 F.2d at 367; Samuels, Kramer and Co., 712 F.2d at 1346.

taxpayers. As explained in the Dripps Declaration, the Internal Revenue Service's investigation relates to an ascertainable group of currently unidentified taxpayers: those who received income attributable to interest on the Certificates from for tax years ending December 31, 2000, 2001, 2002, 2003, and 2004. See Dripps Decl. ¶ 33.

Specifically, the John Doe summons requests information in the Bank's possession, custody, or control indicating the names, addresses, and taxpayer identification numbers of individuals and entities that were holders of, or final recipients of interest paid on, the Certificates from January 2000 through the date of entry of any order issued in connection with this application. See Petition, Exhibit A. This group of taxpayers is ascertainable from the records of the Bank, which serves as the paying agent for the Certificates. Accordingly, the requirement set forth in 26 U.S.C. § 7609(f)(1) is satisfied.

2. IRS Has Reasonable Basis for Belief that Group May Have Failed to Comply with Internal Revenue Laws

In addition, the Internal Revenue Service has a reasonable basis to believe that the John Doe taxpayers have failed to comply with provisions of the Internal Revenue Code.

In seeking to serve a John Doe summons, the IRS is not required to show the existence of "probable cause" to believe that a criminal act has occurred or might be involved. See H. REP. NO. 94-658 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3207; see also United States v. John G. Mutschuler, 734 F.2d 363, 366 (8th Cir. 1984); United States v. Critelli, 572 F. Supp. 349, 352 (W.D.N.Y. 1983). Rather, it is sufficient for the IRS to reveal to the court evidence that a transaction "is of such a nature as to be reasonabl[y] suggestive of the possibility that the correct tax liability with respect to [the] transaction may not have been reported." H. REP. NO. 94-658 at

311, *reprinted in* 1976 U.S.C.C.A.N. at 3207-08. See, e.g., In re Tax Liabilities of John Does, 688 F.2d at 146-47 (affidavit establishing that investors in financing arrangement for purchase of dairy herds might be unlawfully claiming investment credits and depreciation was sufficient to provide reasonable basis for issuance of summons); In re Tax Liabilities of John Does, 671 F.2d 977, 978 & 980 (6th Cir. 1982) (affidavit establishing that tax returns of barter exchange members often exhibited errors in reporting non-cash transactions was sufficient to support investigation of returns of members of a barter exchange similar to barter exchanges which had members whose returns had previously been audited).

The Dripps Declaration explains the basis for the IRS's belief that the John Doe taxpayers may have underreported their taxable income. As discussed above, the Offering Statement, which was used to sell the Certificates to the public, stated that interest on the Certificates is excludible from the bondholders' gross income under Section 103 of the Code. See Dripps Decl., ¶ 33. The City filed a Form 8038-G, forms that apply only to tax-exempt bonds. Id. No Forms 1099 have been issued with respect to the interest paid on the Certificates. Id. It is, therefore, likely that taxpayers who have received income attributable to interest earned on the Certificates treated the income as tax-exempt. Thus, the Service has a reasonable belief that a portion, if not all, of the John Doe taxpayers have understated their taxable income by the amount of income attributable to interest earned on the Certificates. Accordingly, the requirement set forth in 26 U.S.C. § 7609(f)(2) is met.

3. Information Sought Cannot Be Readily Obtained from Other Sources

Finally, the information sought by the John Doe Summonses cannot be readily obtained from other sources. As explained in the Dripps Declaration, the Internal Revenue Service does

not possess the information sought in the summonses. See Dripps Decl., ¶ 34. The IRS has not been provided with Forms 1099 reflecting the identities of the taxpayers that received such interest and in what amounts. Id. The information is, however, readily available from the Bank as the paying agent for the Certificates. See Dripps Decl. ¶ 37. Accordingly, the requirement set forth in 26 U.S.C. § 7609(f)(3) is satisfied.

## Conclusion

For the reasons set forth above, the Court should issue an order (1) permitting issuance and service of the John Doe summons, a true copy of which is attached as Exhibit A to the Petition, and (2) granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

GLENN T. SUDDABY
United States Attorney

*Karen Wozniak*
KAREN WOZNIAK
[Bar Code No.: 105354]
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone (202) 307-1927
E-mail: karen.e.wozniak@usdoj.gov